UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                                   NO. 04 10293 JLT

ANTHONY P. RAYMOND

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNT THREE OF THE SUPERSEDING INDICTMENT**

ARGUMENT

In this case the defendant Raymond moves to dismiss Count Three of the superseding indictment which charges him with using or carrying a assault rifle in relation to an armed bank robbery in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

Section 924(c)(1)(A)(iii) applies where possession by the defendant of a firearm is "an integral part of the predicate offense and facilitates the commission of that offense." *United States v. Meggett*, 875 F.2d 24, 29 (2d Cir.), cert. denied 493 U.S. 858 (1989); see also United States v. Torres, 901 F.2d 205, 217-18 (2d Cir.), cert. denied, 498 U.S. 906 (1990).

The evidence that is set out in the annexed transcripts of Grand Jury testimony, and F.B.I. 302 reports relating to interviews with co-defendants clearly

establishes that this defendant, Raymond, had no knowledge that the weapon was an "assault rifle" within the meaning of the statute nor that it was to be used as "an integral part" of the "predicate offense".

The defendant Raymond had never expressed a readiness to participate in a robbery nor to use an assault weapon "facilitates the commission of that offense". No reasonable grand jury on this evidence could have found that (1) Raymond had "possession" of the assault rifle which requires knowledge, or that it was integral to his role in bank robbery, and (2) the assault rifle possessed by a co-defendant at the co-defendant's home facilitated the bank robbery.

The facts, from the annexed statements and testimony establishes that Raymond never held the rifle, never examined it, nor was ever told what it was to be used for. No such evidence was ever presented to the grand jury.

The Constitution guarantees every person the right to indictment by a grand jury in connection with a federal felony charge. "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury. . ." United States Constitution, Amendment V. The grand jury has been an integral part of the federal criminal justice system since this country's inception, and as discussed below, is intended to serve as a check on prosecutorial overreaching and excesses by injecting the involvement of average citizens into the criminal process in its early stages.

The grand jury has two principal functions. First, it must investigate crime and determine whether probable cause exists to believe that a crime has been

2

committed. *United States v. Mechanik*, 475 U.S. 66, 73 (1986)(O'Connor, J. concurring). Second, and more importantly, the grand jury is to stand as a check between the government and its citizenry, and ensure that indictments are brought fairly and properly. *Hale v. Henkel*, 201 U.S. 43, 59 (1906). See *Wood v. Georgia*, 370 U.S. 375, 390 (1962)(grand juries "serve the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will.")

The principle that "the powers of the grand jury may be used only to further its investigation. . .[is] well recognized." *In re Antitrust Grand Jury Investigation*, 714 F.2d 347, 349 (4th Cir. 1983). The grand jury serves an independent investigatory function and "is not meant to be a private tool of the prosecutor." *United States v. Fisher*, 455 F.2d 1101, 1105 (2nd Cir. 1972). In, *Fisher, supra*, the Court described the function of the grand jury as follows:

> [T]he purpose of the Fifth Amendment guarantee that no individual may be charged in federal felony cases except by indictment or presentment of a grand jury was to provide protection to those who would be 'held to answer', i.e. prosecuted, and those who are not 'held to answer.' The Grand Jury's mission is to clear the innocent, no less than to bring to trial those who may be guilty, and it is within the power of the federal courts to make certain the grand jury does serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor.

See also *Application of Jordan*, 439 F.Supp. 199, 206 (S.D.W.Va. 1977)(citing and quoting *United States v. Dioniso*, 410 U.S.1 (1973). It is the Court's responsibility to see that the grand jury performs its duties unimpeded. *United States v. Font-Ramirez*, 944 F.2d 42, 46 (1st Cir. 1991).

In this case facts relating to the essential element of knowledge and "use" by the defendant Raymond were never presented to the grand jury.

In *Bailey v. United States*, 516 U.S. 137 (1996) the Supreme Court held that a conviction pursuant to and subdivision of Section 924(c)(1) requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the Page II firearm an operative factor in relation to the predicate offense. Evidence of the proximity and accessibility of the firearm to the perpetrators is not alone sufficient to support a conviction for "use" under the statute.

In *Bailey* the Court ruled that "use" must connote more than mere possession of a firearm by a person who commits an enumerated offense, the Court's accessibility and proximity standard renders "use" virtually synonymous with "possession" and makes any role for the statutory word "carries" superfluous. Section 924(c)(1)'s language instead indicates that Congress intended "use" in the active sense of "to avail oneself of" *Smith v. United States*, 508 U.S. 223 (1993). This reading receives further support from 924(c)(1)'s context within the statutory scheme, and neither the section's amendment history nor *Smith, supra,* is to the contrary.

4

Thus, to sustain an indictment under the "use" prong of 924(c)(1) offenses, the Government must show that the defendant actively employed the firearm during and in relation to the predicate crime. Under this reading, "use" includes the acts of brandishing, displaying, bartering, striking with, and firing or attempting to fire, a firearm, as well as the making of a reference to a firearm in a defendant's possession. Obviously the "use" under active-employment reading of that word requires knowledge that the weapon is to be used.

Pursuant to 18 U.S.C. Sec. 924 (c)(1)(A)(iii) absent evidence presented to the grand jury that the defendant, Raymond, knew that the firearm was an assault rifle count three of the indictment must fail.

There is no dispute that Mr. Raymond did not personally "use or carry" an assault rifle in relation to the predicate offense. And there was no evidence the he knew of this fact presented to the grand jury.

At the time of the offense, 18 USC 924(c)(1)(A)(iii) provided, in pertinent part, "Whoever, during and in relation to any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a Court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such . . .crime, be sentenced to imprisonment for five years, . . . and if the firearm is an assault rifle, . . . to imprisonment for thirty years.

In *Staples v. United States*, 511 U.S. 600 (1994), the Supreme Court held that, to obtain a conviction under the National Firearms Act, 26 U.S.C. Sec.5861(d), the government must prove beyond a reasonable doubt that the

5

defendant knew of the characteristics of his firearm which brought it within the statutory definition of a machine gun. See *Staples*, 511 U.S. at 618-20. In *Jones v. United States*, 119 S. Ct. 1215 (1999), the Court held that 18 U.S.C. sec. 2119, the federal car jacking statute, establishes three separate offenses rather than one offense with separate enhancements. See *Jones*, 119 S. Ct. at 1228. Both cases support the defendant Raymond's argument that evidence of specific knowledge of the type of weapon and its use in the predicate crime must be presented to a grand jury.

The Court emphasized in *Staples* and *Jones* that "[m]uch turns on the determination that a fact is an element of an offense rather than a sentencing consideration." *Jones*, 119 S. Ct. at 1219.

The statute in *Staples* prohibited possession of certain types of firearms, but was silent regarding the mental state required to commit the offense. The *Staples* Court was concerned that "dispensing with . . . a *mens rea* requirement would . . . result[] in reading the statute to outlaw a number of apparently innocent acts." *Staples*, 511 U.S. at 610. Such concerns are present in this 924(c)(1)(A)(iii) case because Count Three of the Indictment is not a case where a sentence is enhanced under the Guidelines based on the type of weapon he carried but rather since the Sentencing Guidelines have been held unconstitutional, it is an element of the offense to be proved beyond a reasonable doubt. Since a sentence in which the base offense level was increased based on judicial fact finding by a preponderance of the evidence, violated a defendant's Sixth Amendment rights (as well as other

6

newly instituted statutory rights) as set forth in *United States v. Booker*, \_\_U.S.\_\_, 125 S.Ct. 738 (2005) the following case that held the type of weapon was a sentence enhancemen are no longer applicable. See *United States v. Shea*, 150 F.3d 44, 52 (1st Cir.), cert. denied, 119 S. Ct. 568 (1998) (quoting *United States v. Brantley*, 68 F.3d 1283, 1290 (11th Cir. 1995)); see also *United States v. Gilliam*, 167 F.3d 628, 638 (D.C. Cir.), cert. denied, 119 S. Ct. 2060 (1999).The rationale for these holdings was that a separate *mens rea* for the type of weapon need not be proven is the view that .924(c)(1)(A)(iii) was a sentencing enhancement rather than an element of the offense. However, even prior to *Booker* a very broad statement in *Jones* seems to call this rationale into question. There, the Court articulated the principle that:

> ...under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Jones*, 119 S. Ct. at 1224 n.6.

Clearly because the fact that the firearm was an assault rifle increases the defendant's sentence from five to thirty years, the assault rifle provision of Sec. 924(c) is an element of the offense, for which a separate *mens rea* must be proven. and therefore evidence of the same must have been presented to the grand jury. The "firearm type" provisions of § 924(c)(1)(A) are elements of the crime. The Ninth Circuit, has held "[i]f the 30-year consecutive sentence is to be imposed under section 924(c)(1), the fully automatic character of the firearm must be

7

found by the jury; that is to say, it is an element of the crime." *United States v. Alerta*, 96 F.3d 1230, 1235 (9th Cir. 1996). The Sixth Circuit also stated that "if the jury returns a guilty verdict on the gun charge, it must specify which category or categories of weapons it unanimously has found the defendant was using or carrying." *United States v. Sims*, 975 F.2d 1225, 1235 (6th Cir. 1992).

The application of the requirement that the character of the firearm must be found by the jury and an indictment returned on no evidence of a *mens rea* on the part of the defendant in this case violated the Sixth Amendment principles established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), reiterated in *Blakely v. Washington*, 542 U.S. \_\_, 124 S. Ct. 2531 (2004), and *Booker*. It is apparent from the minutes of the grand jury that the government proceeded on the theory in presenting the case to the grand jury, that the trial judge, rather than the jury, would determine the nature of the defendant's culpability for an assault rifle. The government was required to plead in the indictment and present evidence to the grand jury "every fact . . . used to increase [the defendant's] sentence above the statutory maximum, . . ." *Blakely*.

## CONCLUSION

The government by treating the character of the firearm and knowledge of the intended use of the firearm in commission of the predicate act as "sentencing" matters and not as elements of the offense, failed to produce any evidence before

8

the indicting grand jury of the defendant's knowledge of the intended use or the character of the firearm and therefore count three must be dismissed.

/s/ Roger Witkin
Roger Witkin
6 Beacon Street, Suite 1010
Boston, MA 02108
Tel. 617 523 0027
Fax 617 523 2024
BBO No. 531780

DATE: April 22, 2005

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                    **CRIMINAL NO.** 04 10293 JLT

ANTHONY P. RAYMOND

### CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the within document was served upon the attorney of record for the United States, AUSA Paul Moore, and a courtesy copy to the Clerk of Court by mail and electronic filing, which was e-filed this day.

                                                                          /s/ *Roger Witkin*
                                                                        Roger Witkin
                                                                        6 Beacon Street, Suite 1010
                                                                        Boston, MA 02108
                                                                        Tel. 617 523 0027
                                                                        Fax 617 523 2024
                                                                        BBO No. 531780

DATE: April 22, 2005



BOWMAN - 12/8/04                                     10

1       A    Yeah.  For about a half an hour or so.
2       Q    All right.  And you, you'd tell him how things had
3  gone?
4       A    Right.
5       Q    All right.  And did you discuss anything else that
6  comes to mine?
7       A    Not necessarily.  No.
8       Q    All right.
9       A    Just what happened.
10      Q    And, and, so, you eventually split up that
11 evening?
12      A    Right.
13      Q    And did you take your mother's car or--
14      A    I did.
15      Q    Okay:  Do you remember where you dropped him off
16 or--
17      A    He was, we went back to Everett to my house.  We
18 stopped at his employment, where he works, and we went back
19 to my house.
20      Q    Okay.  Let's see?  Going back to the meeting of
21 the four participants before the robbery, there was a gun
22 involved.
23           Right?
24      A    Correct.
25      Q    Now, what, what kind of gun was that?



BOWMAN - 12/8/04                                                         11

1     A    It was a, I believe it was a Chinese assault
2  rifle.
3     Q    All right.  And you had possession of that?
4     A    I did.
5     Q    All right.  And, and, so, who was present when you
6  first had possession of that?  Who was--
7     A    All four.
8     Q    Okay.  And that includes Mr. Raymond?
9     A    Yes.
10    Q    All right.  And, so, did you present that gun,
11 then, to Mr. Marchese?
12    A    I did.
13    Q    All right.  And he took it, and from that point
14 you were not in possession of it again.
15         Right?
16    A    Correct.
17    Q    All right.  And let me, let me ask, did Mr.,
18 Mr. Raymond, did he express reservations about being
19 involved in the robbery?
20    A    He didn't necessarily want to be generally
21 involved as far as, you know, driving to the bank, going in,
22 waiting outside.
23    Q    So,--
24    A    He didn't really want to be involved.  He said
25 that he would pick us up after the fact.


91A-BS-94218

iation of FD-302 of __Frank R. Bowman Jr._____, On __10/18/2004__, Page __4__

On the way home from CONLON'S, BOWMAN saw FICO chasing another unidentified individual (UI) around a car on Summer Street in Everett. FICO told BOWMAN that the UI was saying bad things about MARCHESE'S daughter. FICO chased the UI away and approached BOWMAN. FICO had his motorcycle with him when this happened.

FICO asked BOWMAN "Did you talk to Mark about this thing?" FICO told BOWMAN to talk to MARCHESE. FICO did not appear to be nervous when he was talking to BOWMAN. BOWMAN believed that FICO knew about the bank robbery. According to BOWMAN, FICO looked up to MARCHESE and idolized him.

Approximately 7-10 days prior to the bank robbery BOWMAN saw FICO at a party in the Everett projects. BOWMAN saw FICO passed out on the floor. It took MARCHESE approximately one hour to wake FICO. BOWMAN thought that FICO had been drinking beer and taking kolonopins at the party. FICO has been known to smoke pot.

BOWMAN went straight home after talking with FICO. BOWMAN was at home with his brother LEE when MARCHESE called to say he was coming over. BOWMAN'S family had left for Novia Scotia prior to MARCHESE'S phone call. After LEE left, BOWMAN went to the attic, retrieved the assault rifle, and placed it on the kitchen table.

After retrieving the rifle, BOWMAN called RAMONE and asked for a ride to the MALDEN MOTEL on Route 99 in Everett. BOWMAN'S brother, SEAN BOWMAN, lived in an apartment at this motel. BOWMAN needed to pick up his mother's station wagon which was parked outside of his brother's apartment. BOWMAN described the station wagon as a red Ford Taurus.

RAMONE arrived at BOWMAN'S house just before MARCHESE and FICO. RAMONE knew something was going on and tried to talk BOWMAN out of it. BOWMAN did not know if RAMONE was asked to participate in the bank robbery. After MARCHESE and FICO arrived at BOWMAN's house the four men sat down on the porch and had a beer.

After finishing their beer BOWMAN and RAMONE drove to the MALDEN MOTEL and picked up the red station wagon. After retrieving the station wagon RAMONE returned to work and BOWMAN

054

91A-BS-94218

Continuation of FD-302 of _Frank R. Bowman Jr._ , On _10/18/2004_ , Page _5_

returned home. MARCHESE and FICO were sitting on the front porch when BOWMAN returned home.

BOWMAN entered the house and placed the assault rifle in a trash bag. BOWMAN brought the rifle onto the porch and gave it to MARCHESE.

After taking the rifle MARCHESE said "Let's go, let's do this." BOWMAN attempted to call off the bank robbery because MARCHESE had told him "If you don't want to do this just tell me." After BOWMAN told MARCHESE that he didn't want to participate in the bank robbery, MARCHESE replied "What the fuck? Why would you tell me you wanted to do this and then back out?" MARCHESE did not specifically threaten BOWMAN or his family but the two argued about doing the bank robbery.

The three men drove to the STOP 'N SHOP along Route 28 in Stoneham, Massachusetts. MARCHESE and FICO drove the stolen jeep and BOWMAN drove the red station wagon. The three men drove into the parking lot in the rear of the STOP 'N SHOP and parked the vehicles.

MARCHESE and FICO exited the jeep and got into the station wagon to change their clothes. MARCHESE was in the back seat and FICO was in the cargo area of the station wagon.

MARCHESE put on a blue jumpsuit and FICO put on black clothes and gloves. Both men had a bandana type covering on their heads. Both MARCHESE and FICO wore another set of clothes underneath the clothes worn during the robbery. BOWMAN wore sunglasses and a baseball cap. MARCHESE and FICO left a green bag, a pair of sneakers, and some other clothes in the station wagon.

The day after the bank robbery BOWMAN went to RUSSELL DISPOSAL and discarded the clothing, sneakers, and bag, that MARCHESE and FICO left in the station wagon.

After changing their clothes the three men exited the station wagon, got into the stolen jeep, and drove to Malden. BOWMAN drove the jeep, MARCHESE was in the passenger seat, and FICO was in the back.

The stolen jeep was a "piece of crap." The brakes did not work and there was very little gas in the tank. BOWMAN 055

91A-BS-94218

Continuation of FD-302 of __Frank R. Bowman Jr.__ , On 11/09/2004 , Page 2

    BOWMAN said that people "on the street" know FICO has talked with the Police. BOWMAN stated that he is cooperating because "I have to do what I have to do. It's survival of the fittest." BOWMAN is more worried about himself being hurt than for his family because of his cooperation with the FBI. According to BOWMAN "RAYMOND knows a lot of people." RAYMOND may know some people in Charlestown, Massachusetts that commit crimes.

    BOWMAN has heard that FICO is saying "stupid stuff." BOWMAN wants nothing to do with FICO. A few individuals have asked BOWMAN if BOWMAN wants them "to do something" to FICO but he told them not to do anything to FICO.

    BOWMAN met MARCHESE one month before the robbery. BOWMAN stated that they "just clicked." BOWMAN did not have any involvement with MARCHESE before this time.

    BOWMAN has not spoken with MARCHESE since 10/17/2004. BOWMAN has not received any messages from MARCHESE.

    Prior to the bank robbery, MARCHESE, BOWMAN, and RAYMOND met on several occasions to discuss their plans for the bank robbery. MARCHESE did most of the talking during these meetings. RAYMOND knew that MARCHESE was planning a bank robbery. RAYMOND did not want to participate in the actual robbery but said he was willing to drive the switch car.

    During the meetings RAYMOND stated "I don't want to be part of the planning. If you guys need me to drive I will pick you up." BOWMAN stated "He said he would be where we needed him to be but did not want any part of the bank robbery."

    BOWMAN and RAYMOND had several conversations before the robbery where RAYMOND tried to talk BOWMAN out of doing the robbery.

    On the day of the bank robbery BOWMAN met with RAYMOND, MARCHESE, and FICO at his house located at 19 Waters Avenue, Everett, Massachusetts. The four men discussed the plan for the robbery. MARCHESE did most of the talking and RAYMOND said very little.

    BOWMAN brought the assault rifle to MARCHESE during this meeting. RAYMOND did not handle the assault rifle.

011

91A-BS-94218

Continuation of FD-302 of ___Frank R. Bowman Jr._____, On _11/09/2004_, Page __3__

    MARCHESE did not threaten RAYMOND into helping with the bank robbery.

    RAYMOND drove a red Ford Taurus station wagon owned by BOWMAN's mother to the RED STONE SHOPPING PLAZA in Stoneham, Massachusetts. The station wagon was going to be used as the switch car in the bank robbery.

    The plan was for RAYMOND to wait in the station wagon at the shopping plaza until the other three men returned from the bank robbery. RAYMOND would then drive them back to 19 Waters Avenue, Everett, Massachusetts.

    Approximately one hour after the bank robbery BOWMAN called RAYMOND on his cell phone and asked RAYMOND to pick him up. BOWMAN was hiding in Stoneham near the location where he left the jeep.

    RAYMOND picked up BOWMAN and the two men drove for a couple of hours before returning to BOWMAN's house. After they returned to BOWMAN's house RAYMOND got into his truck and the two drove to RICHIE's SLUSH. BOWMAN then returned home.

    BOWMAN had obtained the assault rifle from CRAIG HUNT. BOWMAN and HUNT used to work together at MYSTIC PAVING. HUNT had no involvement in the bank robbery.

    HUNT had asked BOWMAN to store the rifle at his house.

    BOWMAN saw HUNT several days ago. HUNT asked BOWMAN for his $800.00. BOWMAN stated that HUNT is afraid of him.

    HUNT had a court date in Cambridge, Massachusetts on Monday or Tuesday. If HUNT was cleared after his appearance he planned to travel to Florida to see his girlfriend. His girlfriend just had a baby. HUNT is the father of the baby.

    HUNT may live in a second floor apartment located at the corner of Pearl and Oakland Street in Everett, Massachusetts. He may have several roommates who are "junkies."

    The apartment complex is tan in color, has a porch and a chain link fence. There is a shed in the back. It is located across the street from an American Legion post and the yard is located next to a parking lot.

012

```
 1    Q    All right. What's the house look like? Do you
 2  remember, like, the color or anything?
 3    A    Pretty, white two, two floors.
 4    Q    All right. All right. Was there a car in front
 5  besides the Jeep at all or--
 6    A    His friend Tony's car. Richie's Slush truck was
 7  in front.
 8    Q    What is it?
 9    A    Richie's Slush.
10    Q    What's that?
11    A    It's a slush, a slush company.
12    Q    Okay. Okay. And, well, what happened, what
13  happened next? Were the four of you discussing--
14    A    I was, they were just saying stuff, and I was just
15  sitting there.
16    Q    What kind of stuff were they saying?
17    A    About the, the bank robbery, and, then, they
18  brought the gun out.
19    Q    Okay. And what, what did the gun look like? Do
20  you remember?
21    A    Like a rifle with a banana clip.
22    Q    Yeah. Do you, do you happen to know the kind of
23  rifle it is?
24    A    No.
25    Q    All right. Did, who brought it out?
```

```
 1        A    Bowman.
 2        Q    Okay. And what did your, did he, did he hang on
 3   to it, or did he give it to somebody?
 4        A    He was holding it, and, then, like, my cousin
 5   asked to see it.
 6        Q    Okay. And what, what happened then?
 7        A    Then, they discussed that they needed another,
 8   more cars, and they, my cousin was saying that, like, he was
 9   going to get more, and, then, Bowman told him that he could
10   get a car.
11        Q    Okay. And what was the purpose of having, why did
12   they need more cars? What was that about?
13        A    They needed more getaway cars.
14        Q    Yeah. All right. For, for, like, what point in
15   the getaway? Do you know?
16        A    No.
17        Q    All right. Okay. So, what happened next?
18        A    Bowman and "Razor" left to go get the car.
19        Q    Okay. "Razor" did you say?
20        A    Yeah. They call him, that's what they call him.
21        Q    That's Tony Ramon?
22        A    Yeah.
23        Q    All right. And they left to get what, what car?
24        A    Bowman's mother's car.
25        Q    Okay. What kind of car is that?
```

(10-6-95)

91A-BS-94218

uation of FD-302 of ___Joseph A. Fico_____, On __08/26/2004__, Page __4__

FICO initialed and dated the pictures. These photos were later submitted to evidence as Pictures 3A and 3B.

FICO stated that prior to retrieving the rifle MARCHESE had taken off the gloves he was wearing and gave them to BOWMAN. MARCHESE said he had more gloves in the car. MARCHESE, BOWMAN, and RAMONE wore gloves while handling the rifle. MARCHESE had difficulty making the rifle work so BOWMAN showed MARCHESE how to function the rifle. BOWMAN stated that $1,000.00 of the money they steal from the bank would have to go to the "kid" who supplied the weapon.

FICO was told by MARCHESE, BOWMAN, AND RAMONE that there "were no bullets in the gun" and that "nobody would get hurt." FICO never held the rifle or checked it to see if it was actually unloaded.

According to FICO, MARCHESE was the person in charge. He was telling the other three what to do. Originally MARCHESE wanted to do the robbery at 2:00 p.m. but because they had to wait for BOWMAN to get his mother's car, MARCHESE said "it's getting late, we don't need another car" and the four men left BOWMAN's house. FICO didn't know which bank they were going to rob.

RAMONE and BOWMAN drove the red station wagon while MARCHESE and FICO followed them in the black jeep. MARCHESE drove the jeep and RAMONE drove the red station wagon.

The two cars proceeded to a shopping plaza in Stoneham, Massachusetts, located along Route 28. FICO believes the shopping plaza was the RED STONE SHOPPING PLAZA. FICO described the plaza as having a lot of shops, a SHAWS in the back, and woods nearby. FICO stated that he would know the plaza if he were to see it again.

Both cars proceeded into a parking lot in the rear of the plaza in order to prepare for the robbery. FICO exited the jeep and went to the back of the station wagon to get his camouflage bag. FICO changed clothes in the back of the station wagon and left his bag in the station wagon at the direction of MARCHESE. MARCHESE changed his clothes while standing outside by the jeep. BOWMAN wore a cap with an "official looking", police insignia on it and sunglasses.

208